### GEORGE DULLNIG ET AL. v. WEEKES, McCARTHY & CO. ET AL.

Delivered April 1, 1897.

**1. Action on Promissory Note—Parties—Receiver of Railroad.**

In an action against a railroad company on a note executed by it, a receiver of the company is not a necessary party.

**2. Pledge—Sale—Notice.**

A power annexed to a note expressly authorizing a private sale of bonds transferred as collateral security for the note, "without advertisement or notice," authorizes a sale without notice to either the pledgor or the public.

**3. Same—Same—Failure to Ask Bid.**

A sale of railroad bonds by a pledgee thereof, empowered to sell the same at private sale without notice, is not invalid merely because he offered to sell the same for a specified amount, without asking the purchaser to make a bid, where he had previously informed himself as to the value of the bonds, and the price asked was double such value.

**4. Principal and Surety—Contribution.**

One who is induced to sign a note as surety at the request of other sureties, is not liable to contribution on the payment of a note by the latter, where it is shown that the note was given for the use of the latter.

APPEAL from Galveston. Tried below before Hon. WILLIAM H. STEWART.

*Shook & Shook, E. R. Guenther*, and *Mott & Armstrong*, for appellants.

1. A sale of property pledged as collateral security can only be made after reasonable notice to the pledgor that a sale will be made, and notice of the time and place of such sale. Jones on Pledges and Col. Sec., secs. 610, 607, 603.

2. To constitute a valid sale of property pledged as collateral security for a debt it is necessary that there be a bona fide bid of a purchaser. There can be no sale in law where the holder of the pledge, who is also the beneficiary, fixes and determines the price at which he will part with the property without a bid from the so-called purchaser. To permit him so to do is to make him both buyer and seller, and does not satisfy the requirements of a sale in law of collateral securities.

3. A general partner in a firm holding property in pledge as collateral security is incapacitated from purchasing at a sale made by the firm equally with the firm itself, because such a partner is one of the persons

who have a duty to perform in the conduct of the sale which is inconsistent with the character of purchaser. Jones on Pledges and Col. Sec., secs. 636, 740.

No brief for appellees reached the Reporter.

WILLIAMS, ASSOCIATE JUSTICE.—This suit was instituted on the 15th day of April, 1895, by appellees, Weekes, McCarthy & Co., against the San Antonio and Gulf Shore Railway Company, George Dullnig, H. O. Engelke, and John Ireland, as the makers of the following promissory note:

"$15,000.00.                        GALVESTON, TEXAS, Dec. 3, 1894.
"Sixty days after date, for value received, we, or either of us, promise to pay to Weekes, McCarthy & Co., or order, at their office in Galveston, Texas, fifteen thousand dollars, with interest from maturity at 8 per cent per annum, and 10 per cent additional if placed in the hands of an attorney for collection after maturity, having deposited with said Weekes, McCarthy & Co., as collateral security for payment of this or any other liability or liabilities of ourselves to them, due or to become due, or which may be thereafter contracted, the following property, viz: Thirty thousand dollars first mortgage bonds of the San Antonio and Gulf Shore Railway, with full power and authority to said Weekes, McCarthy & Co. to sell, assign, and deliver the whole, or any part thereof, or any substitutes therefor, or any additions thereto, at any public or private sale, at their option, on the non-performance of this promise, or the non-payment of any of the liabilities above mentioned, or at any time thereafter, without advertisement or notice, which are hereby expressly waived. And after deducting all costs and expenses for collection, sale and delivery to apply the residue of the proceeds of such sale or sales to pay any or all of said liabilities to said Weekes, McCarthy & Co., or their assigns, as they shall deem proper, returning the overplus to the undersigned.
                        (Signed)    "JOHN IRELAND,
                                    "Pres. S. A. & G. S. R. R.;
                                    "JOHN IRELAND,
                                    "GEO. DULLNIG,
                                    "H. O. ENGELKE."

The petition alleged that the bonds therein mentioned had been sold, and had brought the sum of $300, which was allowed as a credit. For the balance due and an attorney's fee judgment was asked against the defendants.

The railway company defaulted. Ireland pleaded that he was the surety of all the other parties to the note, and asked that the judgment fix his rights as such. Dullnig and Engelke pleaded that, on the 5th day of February, 1895, a receiver was appointed by the District Court of Bexar County of the property of defendant railway company, who, on the 11th

day of May, 1895 (the order of appointment having been in the mean-
time suspended, pending an appeal therefrom), had taken possession of
all its property, and still held the same, and they urged that such receiver
was a necessary party to this action. They further pleaded that the
alleged sale of the bonds had been made by plaintiffs to one of their firm
fraudulently and without notice, for a grossly inadequate price, and asked
that such sale be set aside, and that the bonds be sold under execution to
satisfy such judgment as should be rendered. They denied Ireland's alle-
gation that he signed the note as their surety, and alleged that Ireland
and themselves signed as co-sureties of the railway company.

The court having overruled the plea in abatement, the case was tried
before a jury, to whom was submitted, as will appear more fully further
on, the bona fides of the sale of the bonds, and the issue as to Ireland's
suretyship, and a verdict having been returned in favor of plaintiffs upon
the first, and in favor of Ireland on the last issue, judgment was entered
accordingly.

Our conclusions of law and fact may be conveniently stated in connec-
tion with the assignments of error.

We do not think the receiver was a necessary party to this suit. No
judgment was sought against him, nor was there any effort to disturb
him in the management and control of the property of the railroad com-
pany. The latter did not lose its existence by the appointment of a re-
ceiver, and was still subject to be sued upon a cause of action existing
against it.

The eighth, tenth, twelfth, fourteenth, eighteenth, twenty-first, twenty-
second, and twenty-third assignments of error all relate to the alleged
sale of the bonds, and the rulings of the court, and the finding of the
jury with reference to that issue. It appeared from the evidence that a re-
ceiver of the railway company had been appointed before the maturity of
the note and the sale of the bonds. Plaintiffs, Weekes, McCarthy & Co.,
and the alleged purchaser, Selkirk, all stated that the bonds had no mar-
ket value whatever. Ireland and Dullnig, in their testimony, state the
same fact, and Engelke makes no statement on the subject. Nothing
whatever is shown to induce the belief that the bonds could have been, or
could now be made to sell for more than they brought, and the verdict
of the jury, and the action of the court below and of this court in sus-
taining it, must be viewed in the light of this very potent fact. With ref-
erence to the alleged sale, Weekes says he made inquiries in the Galveston
market of a banker and a bond broker who were familiar with such mat-
ters, and ascertained that there was no market for these bonds, and that
the highest valuation placed upon them was five dollars per bond; that
he then sold them to his partner, Pierce (one of the plaintiffs); who gave
$10 per bond, or $300 for the thirty. McCarthy testifies that he sold the
bonds to Selkirk for $300, and that the latter subsequently sold them to
Pierce for the same amount, and Selkirk makes the same statement.

The court charged the jury: "If you believe from the evidence that
the plaintiffs made a bona fide sale of the bonds specified in the note,

then it is not necessary to consider the question of the bonds; but if you believe from the evidence that the sale of the bonds by plaintiffs was not bona fide, but a mere sham, then the defendants would be entitled to have the bonds sold as under execution," etc. Further on the court gave the jury the form in which they should return their verdict, if they believed "that the bonds were not bona fide sold, but that the sale was a mere sham." Upon the issue thus submitted, the jury probably reconciled the evidence of Weekes with that of McCarthy and Selkirk, by finding that the two latter had agreed upon and consummated the sale, and that Selkirk, with the knowledge of Weekes & McCarthy, had then sold to Pierce, and that the first sale was either unknown to or forgotten by Weekes. The parties appear to have attached very little importance to the matter.

We therefore conclude, in accordance with the verdict, that there was a sale made by Weekes, McCarthy & Co. to Selkirk, and that the latter sold to Pierce. This sale was made by McCarthy, after the information was obtained as to the worthlessness of the bonds, offering the bonds to Selkirk at $10 apiece, and the latter accepting the offer. The bonds remained in the same place of deposit in the bank, and Selkirk, a clerk in the bank, was charged with their price.

It is claimed that the sale was void, because it was made (as was the fact), without any notice to the defendants or to the public.

The power annexed to the note expressly authorized a private sale, and waived "advertisement or notice." We think this should be held to include not only the notice to the public, but the notice usually required to be given to the pledgor. It is usual, where private sale is authorized, to waive notice of either character, as the requirement of neither would be very consistent with the idea of a private sale. The mere authorization of a private sale is said to be an implied waiver of the notice. Here there are both such authority and an express waiver. Jones on Pledges, sec. 611.

It is also urged that a sale could not be made to one of the partners of the firm. This may be admitted with reference to a private sale. Whether, in case of a pledge to secure a debt due to the pledgee, he can purchase at a sale made at public auction, as may a mortgagee with power of sale, we need not decide. Howard v. Davis, 6 Texas, 183; Bohn Bros. & Co. v. Davis, 75 Texas, 25.

Admitting that he may, we think that such a right would not be recognized in him to buy from himself at a private sale, in which all of the terms would have to be fixed by himself. And the incapacity to buy would attach to every general partner in a firm to which the pledge is made. Jones on Pledges, sec. 636; 18 Am. and Eng. Encyc. of Law, 673, and authorities cited.

But the jury were not required by the evidence to find that there was an attempt of the firm to sell to Pierce; and no instruction was requested to the effect that if there was such an attempt it was invalid.

The following charge was requested and refused: "You are instructed

that the disposal of the bonds to Pierce has no bearing upon the issue of a valid sale or not of the bonds in this case, and you will in nowise consider such disposal of the bonds to Pierce as bearing upon the issue of the sale of the bonds under the contract for the sale thereof as set out in the note." This was properly refused, because it either assumed that the sale by plaintiffs was to Pierce, or else required the jury to disregard the evidence of the sale by Selkirk to Pierce, given in explanation of the transaction.

The following charge was also requested, and refused: "If you believe from the evidence that McCarthy did not ask for a bid from Selkirk on the bonds, but told him that he could have them for $300, and that Selkirk accepted McCarthy's proposal, then I instruct you that, in law, there was no valid sale of the bonds."

We do not think the mere circumstances mentioned in this charge would make nugatory a sale otherwise valid. The pledgee was not bound to use efforts to make a sale unfair to the purchaser. If it was a fact that the price at which the property was offered was more than its value, no wrong would be done to the pledgor by the offer of the pledgee to accept such price. There was evidence that the pledgees had informed themselves as to the value of the bonds, and that they fixed upon them a higher price than could have been otherwise obtained. We therefore conclude that the court did not err in refusing charges Nos. 1 and 2, instructing a verdict for defendants on this issue, and that the court did not err in submitting the issue to the jury.

The objections to the charge made in the eighteenth and twenty-second assignments simply complain of its generality, and of the omission to give fuller instruction upon the question submitted. In a general way, the court submitted the issue by instructions not in themselves erroneous, and the omission of more definite rules should have been supplied by requests for the giving of special charges, correctly stating the law applicable.

The complaint made in the twenty-third assignment, that the charge assumed the existence of the sale, is not well founded. That there was at least the form of a sale there could be no doubt, and whether it was real and bona fide, or only pretended—"a mere sham"—was the question left to the jury. In view of the fact before stated, that there is no evidence whatever to show that the plaintiffs gained any advantage, or that the defendants sustained any loss, by the disposition made of the bonds, we can not say that the action of the court and jury were so clearly wrong that we should interfere. To do so, upon the evidence in the record, would, to all appearances, be doing a useless thing, that would only add to the expenses of the suit and benefit no one. Could we see that the plaintiff could have had any motive, by a fictitious sale, to acquire the bonds at the price paid, or that the defendants had probably been injured and deprived of a credit to which they were entitled, we might take very different action, as, indeed, the jury and the court below would probably have done.

The other assignments all question the sufficiency of the evidence to sustain the verdict of the jury that Ireland signed the note as surety for the other defendants.  The law governing the subject is thus stated by Story:  "Thus, for instance, although the general rule is that there shall be contribution between sureties, by the rule of equality, that may be modified by express contract between them; and, in such cases, courts of equity will be governed by the terms of such contracts.  In like manner, there may arise by implication, from the nature of the transaction, an exemption of one surety from becoming liable to contribution in favor of another.  Thus, if one surety should, not upon his mere motion, but at the express solicitation of his co-surety, become a party to the instrument, and such co-surety should afterwards be compelled to pay the whole debt, in such case he would not be entitled to contribution, unless it clearly appeared that there was no intention to vary the general right of contribution in the understanding of the parties."  1 Story's Equity, 12 ed., sec. 498.

The proposition last stated is laid down in some of the cases cited by the author.  Taylor v. Savage, 12 Mass., 98; Cutter v. Emery, 37 N. H., 567; Hendrick v. Whitteman, 105 Mass., 23.

But by many authorities it has been denied that the mere request by one surety of another to sign the obligation has the effect here attributed to it.  Bagott v. Mullen, 32 Ind., 332; McKee v. Campbell, 27 Mich., 407.  The authorities on the subject are discussed and cited in these cases.

Whatever may be the inference to be drawn from the mere request, in the absence of all other circumstances, we think the rule applicable to such cases as this, where the whole history of the transaction and of all the circumstances attending it is given, is correctly expressed in Cutter v. Emery, supra, as follows:  "The principle on which one surety is regarded as liable as a principal to another surety is that a state of facts is shown to the court from which it appears positively, or by fair and reasonable inference, that such surety intended to stand in the character of principal as to subsequent signers," citing 3 Wend., 397, 10 Shep., 470.

Applying this test, we are of the opinion that there was evidence from which the jury could have deduced the necessary intention as a fair inference.  The testimony of Ireland is to the effect that he was requested by Engelke and Dullnig to sign the note.  He states that he signed as their surety, to enable them to get, for their own use, the loan of the money for which the note was given.  He admits that, in their transactions, it was not stated directly that he was to sign only as surety, but the implication that such was the understanding of all of the parties might naturally arise from his account of the circumstances when the loan was made and the note given.  The evidence is voluminous and consists of so many circumstances that we will not undertake to state more than our conclusion that the evidence warranted the jury in finding as they did.  Were we to concede that, in view of the whole of the evi-

dence, the jury did not reach the conclusion which seems to us to be the most reasonable one, this would not authorize us to interfere with the verdict.

*Affirmed.*